Mr. Forbes again, thank you for scheduling them on the same day. In this case, back to the work history issue, we have a very strong person that worked for the company, and that is she kept going back to work after serious operations many times, and also in order to do her work, which was basically a driver at a GM plant, she would drive a truck out onto the lot and then walk back to get another truck. That essentially was the job. So she went back to work many times after serious surgeries, and in order to keep working, she had to take heavy-duty pain medications and at times get epidural injections. So, and this is what I would call a stellar work history that at least ought to be looked at, examined, and weighed against all other factors. This lady made a lot of money. Why would she just throw that away and get $1,250 a month? Were you saying that she tolerated the suffering in order to maintain this very good income? She did. She endured it. Yeah. She did? Yeah. And this is driving pickup trucks and parking them and moving off the assembly line or something? Yes, yes. And she wasn't working for the, what was it, General Motors? Yeah. She wasn't employed by an outside contractor, wasn't she? I think, yeah, I think she was. I'm not sure if she was a member of, yeah, that's correct. So she's understandably wanting to keep working because she's going to make more money than she is on disability. Right. And that is a, you know, people don't give up $50,000 jobs to get $1,250 a month. Unless there's a really good reason and those reasons ought to be explored and weighed by the administrative law judge in the credibility analysis. And then there was also another problem in terms of her daily activities because she took breaks, as I understand it, between them and then she was still on heavy medication, right? Or was she? Her medication regimen actually lessened when she stopped work for a while because she wasn't out hoofing it on the job. She could afford to take lesser levels of medication. But even at that, even with the lesser levels, the way she got through her day was with the And I tried in my exposition of the daily activities, I tried to translate the testimony as close as I could so that you could kind of track the rest and that kind of thing. What do you translate? What do you mean? The testimony on the daily activities, I was trying to, when I put it in my statement of how she was able to get through it. Was this an accommodation the employer made? No, this is afterwards, after she stopped working in her typical day. And the reason it's important is daily activities can be used to show that a person can do a certain exertional activity. And they can also be used to show that they can do full-time work unless they are conducted pretty much the way the claimant did in a manner that has a little bit here, a rest, a little bit here, a rest. Or sometimes the pattern is do a lot on one day, sometimes too much, and then the next day can't do much at all. Are you describing her activity? Well, in general I was, but then I went off into... Well, I'm just trying to figure out what you said rest, and you talked about before and after work, or are you talking about during work you have certain breaks? This is the time after she's done with work. She's no longer working, the daily activities would be what her typical day would be like. After work? No, well, after she stopped working. Yeah, you go home. No, this is during the period where she's not working anymore at all. Oh, I see, so she's not working at all. So now she's doing activity in her daily life. I apologize, my Hoosierisms, my Indiana language was maybe a little imprecise. We're a little lesser from Indiana, so you'll be correct. Maybe it being a little imprecise. I know you're from Indiana too, but sometimes I should be more technical when I talk. But in her day, when she was again, she had stopped working completely, and she eased her pain with ice packs or heat therapy, and she would take a rest between the activities, because that, I mean, the extent of her activities, because as I understand it, one of your challenges is to the administrative law judge's assessment of those daily activities, that somehow because she could do these things with limitations, that that would allow her to work again or qualify to work for, right? I agree, and here I think the ALJ drew the wrong inferences from the daily activities, and that's what the Bjornson case is all about. I'll reserve the rest of my time for rebuttal unless you have questions. Thank you, Your Honor. Thank you, Mr. Fort. Ms. Tate? Good morning. Christy Tate on behalf of the Commissioner. Ms. Stark was actually employed by Allied Automotive, a company that contracted with GM, for which she drove the cars off the assembly line to another portion of the warehouse where she might do inspections of windshields or check the lights. And as another factual matter, Ms. Stark never took heavy-duty pain medication. She contracted hepatitis when she had her twins, when she had her baby, and because of the hepatitis that she contracted, she was barred from taking any heavy narcotic medication. The record shows that she took gabapentin, an anti-epileptic drug that was used to treat neuropathic pain, and she also took Aleve for pain reliever. Well, Dr. Shugart prescribed her daily Vicodin, Nutritin, and Darvocet, and then later on, same thing, Celebrex, and I thought Hydrocodone. Right, that was prior to her pregnancy. Her pregnancy happened after she received those drugs, following her fusion surgery, which is in December 2000. As of September 2012, the only medication she was able to take was the gabapentin and the Aleve. Yeah, but so that doesn't mean that she would not prefer to take the heavy pain meds. It was just prevented. Absolutely. I mean, in terms of just because the drugs were lesser, doesn't mean her pain was less. She just couldn't take what might have helped to leave the situation. That's right, Your Honor. I only correct the medication history to the extent that inferences can be drawn that if she were taking heavy medication, that would have left her too fatigued or too foggy to perform work.  The pain is at issue. Absolutely. So that's what I'm saying. We can't read that it means she had less pain. It's just that she couldn't use the right drugs because of this other condition. Absolutely. Because she continued to complain about the pain. She did complain about the pain. And the severity of the pain. And the ALJ in this case noted that she did not doubt that Ms. Stark suffered from back pain resulting from her spinal fusions and the additional complications from that that were the ALJ issued her decision. But in this case, all three of the doctors who furnished opinions were unanimous in their assessments that Ms. Stark was capable of performing light work. There is no opinion evidence assessing Ms. Stark of greater limitations than those provided in the ALJ's RFC. The ALJ reasonably relied on these unanimous opinions when determining that Ms. Stark could return to her former job as a yard driver. As I said, Ms. Stark, the ALJ acknowledged that Ms. Stark had a long history of back pain and determined that it did constitute a severe impairment. There's no question about that. However, upon reviewing the clinical evidence, the opinion evidence that I just mentioned, and all of Ms. Stark's statements, the ALJ reasonably determined that Ms. Stark's back It would simply limit her to a reduced range of light work. So I guess like you said, the ALJ acknowledged she had all these various conditions and so that's why I have trouble with the ALJ's discrediting her testimony about her pain, saying that it lacked objective support in the record. Of course, her treating doctor had a different view. But, and there's not a lot of mention of the various treatments she received or the conclusion of her treating physician, Shugart. Sure, and she stopped seeing Dr. Shugart before her alleged onset date because Dr. Shugart declared her at maximum medical improvement following her surgeries. She had the spinal fusion in 2000 and then it didn't take, so she had a bone graft in November of the following year and then after that she continued to get well. We do have opinion evidence from other treaters from 2008, so this is two years before her alleged onset date. In January of 2008, Dr. Fortin, her pain specialist, was asked to opine what work, what exclusions Ms. Stark would have in terms of returning to work and he said none. Three months later, her podiatrist, Dr. Jackson, in March of 2008, after Ms. Stark had sprained her right ankle, his opinion said, I would preclude her from working for one more week and then I would return her to full-time work with an orthotic. And other than that, there's no other treating opinion physician saying that she can't work. Moreover, the clinical evidence shows that Ms. Stark continued to have a normal gait. She had five out of five strength in both her arms and her legs. She had full range of motion in all of her joints. There was tenderness in her lower back and above her right hip, however, that was described as mild. And there's nothing in the record following her alleged onset date or anywhere near her alleged onset date, there's nothing in the record showing any significant abnormalities. In this case, the clinical record simply does not support her allegations of debilitating pain to the extent that she could not perform work at all. And of course, we still have this boilerplate language. Yes, the boilerplate is included and the commissioner is aware of this court's prohibition against that. However, in this case, the ALJ went on following the boilerplate language to describe the clinical evidence that she relied on, the opinion evidence that she relied on, the statements that Ms. Stark's made both at the testimony and in 2008. In 2008, the record shows that she took FMLA leave because of her debilitating back pain. However, we have two treating physician notes in 2008 saying, go back to work, take your orthotics, you're cleared to work. That is evidence that Ms. Stark's statements are less than credible. And then following the boilerplate, the ALJ went on to provide the type of specific examples that is required both by this court's ruling and by SSA regulations. While Ms. Stark urges that the ALJ was required to accept all of her subjective complaints, that was not required by the regulations or the case law. The ALJ credited Ms. Stark's complaints to the extent that she limited her to a restricted range of light work. The decision reflects that the ALJ assessed the record, considered all of the medical and opinion evidence, as well as Ms. Stark's credibility, before determining that she retains the ability to perform light work in spite of her back pain. Her decision provides valid reasons for distrusting Ms. Stark's account of her limitations. If there are no other questions, the commissioner will rest on her brief. Thank you. Thank you. The point is, is that before the alleged onset date, yeah, she did go back to work. And she was suffering from pain. And the pain medications are outlined on page 338 of the record. This is in the year 2008. Discontinued Darvocet due to ineffectiveness. Stardivenza. Continued Neurontin and Celebrex. Now Neurontin may be an anti-epileptic, but it's commonly prescribed for neuropathic pain and Neurontin is serious stuff. But the whole point is, is that that's exactly what I was arguing. These are not just subjective complaints of pain. This lady has many back surgeries. If a lady or person with this many surgeries and this kind of work history finally says she has pain to dismiss it just as subjective, that just doesn't seem to honor hard work. Um. Um. I would have to look it up here, but I believe it was a range of life work. Correct. And so what life work was designated as far as? Oh, the judge found she could go back to past work. He did? Yeah. So. Yeah, he said she could go back to that same job. Yeah. This is a step four denial. So that's all the further it went. Yeah. Let me see if there's anything else I'd like to add. I believe the timing in relation to the birth of the twins is incorrect. I think she had the twins quite a number of years. But it does go back to another point. She did have hep C, which she got in a blood transfusion during the hospitalization when she had the babies. And one of the things that hep C does is it messes with your liver to the point that sometimes you can't always take medications that would otherwise help you. So if the point is that she was not able to access all the pain medications she could have, yet she still gutted it out and continued to work, well, that kind of weighs in her favor also. Thank you, Your Honors. Thank you, Mr. Forbes. Thanks to both counsel. The case is taken under advisement.